UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| IN RE: BRADEN R. HARPER | CASE NO. 11-50241-KMS |
| DEBTOR | CHAPTER 7 |
| HANCOCK BANK | PLAINTIFF |
| V. | ADV. NO. 11-05019-KMS |
| BRADEN R. HARPER | DEFENDANT |

## MEMORANDUM OPINION

This matter came before the Court for trial on March 21, 2012, (the "Trial") on the Complaint Objecting to Dischargeability of a Debt (Adv. Dkt. No. 1) filed by creditor-plaintiff Hancock Bank and the Answer to Complaint (Adv. Dkt. No. 7) filed by debtor-defendant Braden R. Harper. At Trial, William P. Wessler represented Hancock Bank and Rickey J. Hemba represented Harper. By stipulation, the parties introduced six exhibits.[1] These exhibits and the testimony of John Michael Meyer were the only evidence presented at Trial. The Court, having considered the evidence, finds that the debt is nondischargeable for the reasons set forth below.[2]

## I. JURISDICTION

The Court has jurisdiction of the parties to and the subject matter of this Adversary pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Notice of the Trial was proper under the circumstances.

---

[1] The Plaintiff introduced five exhibits: (1) Complaint; (2) Transcript of § 341 Meeting of Creditors; (3) Transcript of Defendant's Deposition at the 2004 Examination; (4) Defendant's Proposed Findings of Fact and Conclusions of Law; and (5) Pretrial order. The Defendant introduced one exhibit, a report from the Wiggins, Mississippi, Police Department.

[2] Pursuant to Federal Rule of Civil Procedure 52, made applicable to this Adversary by Federal Rule of Bankruptcy Procedure 7052, the following constitutes the findings of fact and conclusions of law of the Court.

## II. FINDINGS OF FACT

### A. Loan Application/Transaction

On January 23, 2009, Harper entered into a retail installment contract with Bud's Mobile Homes, Inc. for the purchase of a new 2008 Horton Mirage 76 x 16 mobile home (the "Contract"). (Pl.'s Ex. 5, at ¶ 1). The Contract was assigned to Hancock Bank on the same day. In connection with the transaction, Harper executed documents representing that he was purchasing the mobile home, pledging it as collateral to secure repayment of the Contract, granting power of attorney to Hancock Bank to obtain a lien on the title of the mobile home, agreeing to provide the bank with insurance on the mobile home, and representing that he had accepted delivery of the mobile home and that it had been properly set up to his satisfaction. *Id.* Hancock Bank obtained a Mississippi Certificate of Title reflecting perfection of a lien in its favor. *Id.* at ¶ 2. Only a few payments were made on the Contract. *See* (Pl.'s Ex. 5, at ¶¶ 3, 4).

In June of 2010, after payments went into default, Hancock Bank initiated a replevin suit in the County Court of Jackson County Mississippi for the purpose of obtaining possession of the mobile home. (Pl.'s Ex. 5, at ¶ 4). The parties entered into an agreed judgment,[3] in which Harper admitted that the bank was entitled to possession of the mobile home. *Id.* In connection with the replevin suit, Harper represented to the bank that the mobile home had been stolen from a lot in Wiggins, Mississippi and that he was unaware of its location.[4] *Id.* Unable to locate the home, Hancock Bank obtained a judgment[5] against Harper in the amount of $42,980.42 for the balance

---

[3] *See* (Pl.'s Ex. 1, at 8-9).

[4] A police report was filed on December 4, 2009, indicating that Ashley Hughes reported that a mobile home had been stolen from Azalea Homes located at 2110 South Azalea Drive, Wiggins, Mississippi, on or about November 6, 2009. (Def.'s Ex. A). According to the report, Hughes stated that the mobile home was on the premises on November 5, 2009, as she was leaving for work. *Id.* After confirming with a co-worker that the finance company did not pick up the mobile home, Hughes called the Wiggins Police Department to report the incident. *Id.*

[5] *See* (Pl.'s Ex. 1, at 12).

owed on the Contract plus attorney's fees, and initiated a garnishment against Harper's salary at Ingall's Shipbuilding, Inc. *Id.* at ¶ 5-6. Harper filed the instant Chapter 7 bankruptcy case "to stop the garnishment and in an effort to discharge the claims of Hancock Bank." *Id.* at ¶ 6.

**B. Harper's Statements at the § 341 Meeting of Creditors and Rule 2004 Examination**

At the § 341 meeting of creditors,[6] Harper testified under oath that the mobile home transaction was a sham; he never intended to purchase the mobile home. (Pl.'s Ex. 5, at ¶ 7). He further admitted that he neither received nor intended to live in the mobile home; "the money obtained from the Bank was in reality, to be used in the construction of a nightclub called Guitars and Cadillacs,[7] in D'Iberville, Mississippi, pursuant to an arrangement[8] made with John Meyer, one of the owners of Bud's Mobile Homes."[9] (Pl.'s Ex. 5, at ¶¶ 3, 7). Several months later, in his Rule 2004 Examination,[10] Harper denied that the money was used in the nightclub, testifying that he did not know what happened to the funds advanced by Hancock Bank to purchase the Contract.[11] *Id.* at ¶¶ 3, 7.

---

[6] The meeting of creditors was held on March 22, 2011. (Pl.'s Ex. 2).

[7] According to the evidence, Guitars and Cadillacs was a business venture, a nightclub, that was under construction at the time Harper entered into the Contract.

[8] Harper explained the side arrangement with Meyer as follows: Harper would finance the purchase of the mobile home, but Meyer would make the payments. In six months, the debt would be paid off resulting in good credit for Harper. Meyer made a few payments on the Contract before he was incarcerated and entered a drug rehabilitation program. (Pl.'s Ex. 5, at ¶ 3).

[9] Harper's testimony at the § 341 meeting of creditors was as follows:

> "We were building Guitars and Cadillacs in D'Iberville. And [Meyer] wanted me to, I guess, help him, I guess, get money from this mobile home to put into the club. And he told me that if I did this [executed the Contract and related documents to purchase the mobile home] he would end up paying it off in six months and it would look good on me, so I did it. It was stupid on my part. I was young, but . . ."

[10] The 2004 examination was conducted on August 17, 2011. (Pl.'s Ex. 3).

[11] Harper's testimony was as follows:

> Q. The money Hancock Bank advanced that the bank thought was going to buy the mobile home, what happened to the money?

Harper further acknowledged that he misled the bank, in his own words he "told a fib," when a bank representative telephoned him about the delinquent payments. *Id.* During the conversation, Harper indicated that he would resume payments after a month or two. *Id.* In a subsequent conversation, when asked for the address of the mobile home, Harper obtained and relayed an address from Bud's Mobile Homes for a different mobile home. (Pl.'s Ex. 5 at ¶ 3, 7). The parties stipulated that "[f]or the 26 months between the signing of the contract and the meeting of creditors, Harper concealed the sham transaction from the bank and that he had never seen, received or lived in the mobile home, nor did he intend to." (Pl.'s Ex. 5, at ¶ 7).

### C. Meyer's Testimony at Trial

Meyer, an owner of Bud's Mobile Homes and a member of the Guitars and Cadillacs venture, initiated the transaction when he approached Harper about investing in a mobile home that he could place in a mobile home park owned by Meyer and then rent to an employee of Guitars and Cadillacs.[12] Meyer represented to Harper that he would pay the debt and that in the

---

| | | |
|---|---|---|
| A. | I have no idea. | |
| Q. | Was it to be used in connection with Guitars and Cadillacs? | |
| A. | No, sir, not that I know of. | |
| Q. | No? | |
| A. | Nuh-uh. | |

(Pl.'s Ex. 3, at 13:16-24).

| | |
|---|---|
| Q. | Okay. So did the money that the bank advanced for this mobile home go into the construction or somehow the operation of Guitars and Cadillacs? |
| A. | No, sir. Not that I know of. I didn't deal with the finances as far as Guitars and Cadillacs. Like I said, I was a front. |

(Pl.'s Ex. 3, at 17:24 – 18:1-4).

[12] According to Meyer, he owned a mobile home park that could hold eighteen mobile homes. He purchased twelve mobile homes to lease to workers of Guitars and Cadillacs as an investment. The plan was for Harper to buy a mobile home, which would be placed in Meyer's park, and rent it to one of the workers of the Guitars and Cadillacs

worst case scenario Meyer could assume the Contract.[13] Meyer testified that the mobile home was owned by and purchased from Jason Murphy ("Murphy"), owner of Azelea Homes. Murphy was a friend of Meyer and an investor in the Guitars and Cadillacs venture. When questioned about the initial location of the mobile home, its location after purchase and its current whereabouts, Meyer's testimony became erratic and virtually perplexing. He testified that the mobile home "was going, originally, to Woodridge [mobile home park] . . . but they had a policy that the person who puts the mobile home in there had to live in it – they don't let you sub it out." The testimony was unclear as to whether the mobile home was actually delivered to Woodridge Park; however, the totality of the evidence supports the inference that the mobile home was never delivered to Woodridge Park.[14] Meyer's testimony, coupled with the police report, seems to establish that the mobile home never left its original location at Azelea Homes, despite Harper's signature on the delivery receipt attesting that it was delivered and set-up at Woodridge Park. In any event, Hancock Bank was never able to locate the mobile home.

On cross-examination, Meyer's testimony established that at the time Harper entered into the Contract with Bud's Mobile Homes, there was no "red flag" or any evidence that would have alerted Hancock Bank to the misrepresentations in the Contract and related documents or to any issues related to Woodridge Park. Specifically, Meyer testified that the mobile home park "went

---

venture, as an investment. *See also* (Tr. 2004 Exam., Pl.'s Ex. 3, at 12:23-13:15); *see also* (Tr. § 341 meeting of creditors Pl.'s Ex. 2, at 4:10-18).

[13] *See also* (Tr. 2004 Exam., Pl.'s Ex. 3, at 12:23-13:15); *see also* (Tr. § 341 meeting of creditors Pl.'s Ex. 2, at 4:10-18).

[14] Although Harper signed a delivery receipt (Pl.'s Ex. 3, at 18) acknowledging acceptance and delivery of the mobile home at Woodridge Park and that it had been set up to his satisfaction, his testimony at the 2004 Examination established that the mobile home was never delivered to him. (Tr. 2004 Exam., Pl.'s Ex. 3, at 9:9-21). Meyer's testimony at Trial corroborated the fact that Harper never lived in the mobile home despite the representations in the delivery receipt. At Trial, Meyer testified that he could not obtain water for the mobile home park, as required by the city of D'Iberville before mobile homes could be located there. Further, the police report (Def.'s Ex. A) indicated that the mobile home was allegedly stolen off a lot located at Azelea Homes, 2011 South Azelea Drive, Wiggins, Mississippi.

bad"[15] *after* he had made six or eight payments and that his business relationship with Hancock Bank over the past 30 years was, in his own words, "perfect."

### III. CONCLUSIONS OF LAW

Hancock Bank seeks to have its state-court monetary judgment[16] rendered nondischargeable pursuant to § 523(a)(2)(A) and (a)(6).[17] To except Harper's debt from discharge under § 523(a), Hancock Bank bears the burden of proving each of the required elements by a preponderance of the evidence.[18] *See Grogan v. Garner*, 498 U.S. 279, 287-88 (1991); *see also Young v. Nat'l Union Fire Ins. Co. of Pittsburg (In re Young)*, 995 F.2d 547, 549 (5th Cir. 1993); Gen. *Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F. 2d 367, 272 (5th Cir. 2005).

**A. 11 U.S.C. § 523(a)(2)(A)**

Section 523(a)(2)(A) excepts from discharge "any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false

---

[15] Meyer testified that the problem arose when the park could not obtain water. He further testified that at the beginning of the Harper transaction everything "looked good."

[16] The doctrine of issue preclusion may apply in § 523(a) actions to prevent re-litigation of issues previously decided by a state court; however, the ultimate determination of dischargeability resides within the exclusive jurisdiction of the bankruptcy court. *Grogan v. Garner*, 498 U.S. 279, 284 (1991); *Lanier v. Futch (In re Futch)*, Adv. No. 09-00144-NPO, 2011 WL 576071, at * 15 (Bankr. S.D. Miss. Feb. 4, 2011) (*citing Gupta v. E. Idaho Tumor Institute, Inc. (In re Gupta)*, 394 F.3d 347, 349-50 (5th Cir. 2004)). The Court finds nothing in the Agreed Final Judgment in Replevin or the Monetary Judgment reflecting that either judgment was based on a finding of fraud or malicious injury. The judgment for replevin merely held that, under Mississippi law, Hancock Bank obtained a valid security interest in the mobile home and was entitled to possession based on the debtor's default and admission that Hancock Bank was entitled to possession. (Pl.'s Ex. No. 1, at 8-9). The monetary judgment awarded judgment "in the amount of $42,980.42 . . . together with interest at the contract rate of 9.50% from date of judgment until date paid, and all costs incurred in this cause" on the basis that Hancock Bank was unable to locate or recover its collateral. (Pl.'s Ex. No. 1, at 12).

[17] "[T]he issue of nondischargeability [is] a matter of federal law governed by the terms of the Bankruptcy Code." *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir. 1992) (*citing Grogan v. Garner*, 111 S. Ct. at 657-58).

[18] "A fact is proven by a preponderance of the evidence if the Court finds it more likely than not the fact is true." *Lanier v. Futch (In re Futch)*, Adv. No. 09-00144-NPO, 2011 WL 576071, at *16 (Bankr. S.D. Miss. Feb. 4, 2011) (*citing EPA v. Sequa Corp. (In re Bell Petroleum Servs., Inc.)*, 3 F.3d 889, 909-10 (5th Cir. 1993)).

representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A); *Norris v. First Nat'l Bank in Luling (In re Norris)*, 70 F.3d 27, 29 (5th Cir. 1995). "Section 523(a)(2)(A) encompasses three similar grounds for non-dischargeability, all of which apply to 'debts obtained by frauds involving moral turpitude or intentional wrong.'" *In re Futch*, 2011 WL 576071, at *17 (*citing First Nat'l Bank LaGrange v. Martin (In re Martin)*, 963 F.2d 809, 813 (5th Cir. 1992)). The Fifth Circuit has recognized a distinction in the elements of proof required for false pretenses or false representation with those required for actual fraud. *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 403 (5th Cir. 2001) ("[O]ur court has applied different, but somewhat overlapping, elements of proof for § 523(a)(2)(A) actual fraud, as opposed to false pretenses/representation").[19]

Under § 523(a)(2)(A), a representation made by a debtor is a false pretense or false representation if it was: (1) a knowing and fraudulent falsehood; (2) describing past or current facts; (3) that was relied upon by the other party. *In re Mercer*, 246 F.3d at 403; *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292-93 (5th Cir. 1995). The subtle distinction between false pretense and false representation is that false representation involves an express statement, whereas false pretense involves conduct that creates a false impression. *In re Futch*, 2011 WL 576071, at *17 (*citing In re Harwood*, 404 B.R. 366, 389 (Bankr. E.D. Tex. 2009)). Although a promise to perform a future act does not constitute a false pretense or false representation, a debtor's statement of his intentions may fall within the statute if the debtor had no intention of

---

[19] In *Mercer*, the Fifth Circuit questioned whether this distinction survived after *Field v. Mans*, 516 U.S. 59 (1995), but did not resolve the issue as it was not a question before the court. As the District Court for the Western District of Texas noted, the Fifth Circuit treated the three terms identically in its recent decision *General Electric Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367 (5th Cir. 2005); however, it acknowledged the distinction in its unpublished opinion *Jacobson v. Ormsby*, No. 06-51460, 2007 WL 2141961 (5th Cir. July 26, 2007). *See Turbo Aleae Invs., Inc. v. Borschow (In re Borschow)*, 467 B.R. 410 (W.D. Tex. 2012).

performing as promised when he made the representation. *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991); *Allison v. Roberts (In re Allison),* 960 F.2d 481, 484 (5th Cir. 1992).

In contrast with false pretense or false representation, a party objecting to discharge of a debt under § 523(a)(2)(A) for *actual fraud* must demonstrate that: (1) the debtor made representations; (2) the debtor knew the representations were false at the time they were made; (3) the representations were made with the intention and purpose to deceive the creditor; (4) the creditor actually and justifiably relied on the representations; and (5) the creditor sustained a loss as a proximate result of its reliance. *In re Acosta*, 406 F.3d at 373 (*citing In re Mercer*, 246 F.3d 391, 403 (5th Cir. 2001)); s*ee Matter of Bercier*, 934 F.2d 689, 692 (5th Cir. 1991) (*discussing* actual fraud under § 523(a)(2)(A) as explained in *In re Roeder*, 61 B.R. 179 (Bankr. W.D. Ky. 1986)); *E. H. Mitchell & Co. L.L.C. v. Alonzo (In re Alonzo)*, Adv. No. 10-1044, 2011 WL 3586123, at *3 (Bankr. E.D. La. Aug. 12, 2011).

The reliance requirement of § 523(a)(2)(A) requires justifiable, not reasonable, reliance. *Field v. Mans*, 516 U.S. 59, 74-75 (1995). Determining whether reliance is justified is a subjective inquiry that depends on the particular plaintiff and circumstances. *In re Alonzo*, 2011 WL 3586123, at *4.

Hancock Bank sustained its burden to demonstrate that Harper's debt was procured by a false pretense or false representation. The evidence proves that Harper knowingly made several false representations and concealed material facts upon which Hancock Bank relied. Harper signed the Contract and related documents representing that he intended to purchase the mobile home, which he would personally occupy as his residence at Woodridge Park, and repay the debt. However, Harper's own stipulations prove that at the time he made these representations,

he had no present intention of performing them.[20] *See In re Mercer*, 246 F.3d at 407-08 ("A representation of the maker's own intention to do . . . a particular thing is fraudulent if he does *not* have that intention."). In addition, Harper signed a delivery receipt representing that he had accepted delivery of the mobile home at Woodridge Park when, in fact, it was never delivered to him; he never took possession, and never even knew if the mobile home even existed.[21] Harper's silence as to the side arrangement between Meyer and himself to either use the funds for the Guitars and Cadillacs venture or rent the mobile home to a third-party as an investment further constitutes a false representation. *See Manheim Auto. Fin. Servs., Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 131 (Bankr. N.D. Tex. 2005) (silence or concealment of material fact can amount to fraudulent misrepresentation) (*citing see Mercer* at 404; *see also Acosta* at 372). As discussed *infra*, Hancock Bank justifiably relied on Harper's knowingly false misrepresentations.

The evidence also supports a finding of actual fraud. As discussed, Harper made several representations that he knew were false when he made them. These representations were made with the intention and purpose of deceiving Hancock Bank, i.e., with the intention of inducing the bank to finance the transaction by purchasing the Contract. *See Acosta*, 406 F.3d at 372 (intent to deceive can be inferred from debtor's reckless disregard for truth or falsity of statement combined with sheer magnitude of resulting misrepresentation). The loss sustained by Hancock

---

[20] Harper stipulated that he never had any intention of purchasing or occupying the mobile home. *See* Tr. § 341 meeting of creditors, Pl.'s Ex. 2, at 7:1-14; Tr. 2004 Exam., Pl.'s Ex. 3, at 12:4-12:22; Pl.'s Ex. 5, at ¶ 7.

Harper never made any payments to Hancock Bank. This fact further supports the conclusion that Harper never intended to repay the loan at the time he entered the transaction. *See Turbo Aleae Invs., Inc. v. Borschow (In re Borschow)*, 467 B.R. 410, 422 (W.D. Tex. 2012) (distinguishing *In re Sheridan*, 57 F.3d 627 (7th Cir. 1995), in which the court found that debtor's later performance of his promise was strong evidence that debtor intended at time of promise to honor his promise, with its case where partial performance (ie. paying only a small portion of the debt) was of limited value in determining debtor's intent to honor his promise; "what happened after the promise is relevant, but not conclusive").

[21] *See* (Tr. 2004 Exam, Pl.'s Ex. 3, at 12:13-15).

Bank –the unpaid contract– was proximately caused by its reliance on Harper's false representations. *See In re Mercer*, 246 F.3d at 404.

Harper's counsel disputes the "justifiable reliance" requirement of § 523(a)(2)(A), alleging that Hancock Bank practiced "shoddy business"[22] with Bud's Mobile Homes.[23] However, the testimony established that during its thirty-year business relationship with Bud's Mobile Homes, Hancock Bank had no indication of any "red flag." In Meyer's own words, their relationship was "perfect." Nothing on the face of the Contract or related documents alerted Hancock Bank to the true purpose of the transaction. Furthermore, the evidence established that no detectable problems arose in connection with the Harper transaction until approximately six to eight months *after* the Contract was executed. While, Harper's counsel attempted to elicit testimony regarding Hancock Bank's knowledge about the problems with Meyer's mobile home park and Harper's mobile home, Meyer's testimony was unconvincing as to whether any employee of the bank had inspected the mobile home park or knew that Harper's mobile home was not located at Woodridge Park. Thus, the Court finds that Hancock Bank was justified in its reliance on the representations in the Contract and related documents.

The crux of Harper's defense, as represented by his counsel at Trial, is that Meyer should be the prosecuted party. Harper's counsel contends that Harper, although guilty himself, is an innocent victim because he did not gain or benefit from the transaction and never received any

---

[22] In closing remarks, Harper's counsel pointed to Meyer's testimony that he basically had blanket authority from Hancock Bank for $50,000.00 and that there was no insurance on the mobile home to conclude that Hancock Bank conducted business with Bud's Mobile Homes in a "shoddy way." However, Meyer testified that there was insurance on the mobile home for six months and that he did not know if the bank had obtained force placed insurance.

[23] In closing remarks, Harper's counsel also alleged that relief should not be granted due to the fact that Harper never visited Hancock Bank in person, he merely signed the contract documents at the office of Bud's Mobile Homes. However, a loan's characterization as fraudulent does not change if the original creditor later assigns the loan. *In re Borschow*, 467 B.R. at 19-20 (*discussing* policy considerations and language of § 523(a)(2)(A) and holding § 523(a)(2)(A) should discourage fraud regardless of whether creditor later assigns the loan).

proceeds from the transaction. However, in the Fifth Circuit, it is not a necessary requirement that the debtor actually receive a benefit from the debt he obtained by fraud. *Deodati v. M.M. Winkler & Assocs. (In re M.M. Winkler & Assocs.)*, 239 F.3d 746, 749 (5th Cir. 2001); *see In re Futch*, 2011 WL 576071, at * 20. "[O]nce it is established that specific money or property has been obtained by fraud . . . 'any debt' arising therefrom is excepted from discharge." *In re M.M. Winkler & Assocs.*, 239 F.3d at 749 (*citing Cohen*, 523 U.S. at 218-19).

In sum, the undisputed evidence proved that the mobile home transaction was a sham. Harper did not rebut this fact; he stipulated to it. Harper's own admissions proved that the Contract was obtained through false pretense/false representation and actual fraud. Accordingly, the Court finds that Hancock Bank sustained its burden to prove that the debt is nondischargeable under § 523(a)(2)(A). Having determined that the debt is non-dischargeable under § 523(a)(2)(A), the Court need not address the parties arguments under § 523(a)(6).

## B. Hancock Bank's Request for Attorney's Fees, Costs and Punitive Damages

The Complaint requests an award of reasonable costs and fees incurred by Hancock Bank in the filing and prosecution of the Adversary. The Bankruptcy Code does not explicitly authorize an award of fees and costs to prevailing creditors. *Cf.* 11 U.S.C. § 523(d) (Code authorizes fees and costs to prevailing *debtors* under certain circumstances). Although § 523(d) is not a basis for awarding attorney's fees and costs to a prevailing *creditor*, the creditor may be entitled to attorney's fees and costs if the creditor has a contractual right to them under state law. *Jordan v. Se. Nat'l Bank (In re Jordan)*, 927 F.2d 221, 226-27 (5th Cir. 1991). There is no evidence before the Court reflecting any contractual agreement for attorney's fees and costs. Thus, Hancock Bank's request for attorney's fees and costs is denied. The parties shall each bear their own costs.

As to Hancock Bank's request for punitive damages, the Court finds that the facts do not warrant any award of punitive damages under Miss. Code Ann. § 11-1-65(1).[24] The facts establish that regardless of the purpose of the loan, Harper believed that Meyer would repay it and Meyer did, in fact, do so until he was incarcerated. These facts do not meet the heightened standard of conduct required for an award of punitive damages and therefore, Hancock Bank's request for punitive damages is denied.

## IV. CONCLUSION

For the reasons stated above, the debt owed to Hancock Bank is non-dischargeable under §§ 523(a)(2)(A). Further, the requests for attorney's fees and costs and for punitive damages are denied.

A separate judgment consistent with this opinion will be entered in accordance with Rule 7058 of the Federal Rules of Bankruptcy Procedure.

---

[24] A number of courts have held that bankruptcy courts have authority to independently award punitive damages under 11 U.S.C. § 523. *See Cohen v. de la Cruz*, 523 U.S. 212 (1998) (affirming bankruptcy court's award of punitive damages under state law as nondischargeable); *see also First Arlington Nat'l Bank v. Barney's Boats of Chicago, Inc. (In re Barney's Boats of Chicago, Inc.)*, 616 F.2d 164, 166-67 (in trying conversion action, bankruptcy court had authority to award punitive damages); *Kansas Nat'l Bank & Trust Co. v. Kroh (In re Kroh)*, 88 B.R. 972, 985-86 (Bankr. W.D. Mo. 1988) (awarding punitive damages under Missouri law; punitive damages nondischargeable under § 523(a)(6)); *Cook v. Barnett (In re Barnett)*, 95 B.R. 477, 478-79 (Bankr. W.D. Ky. 1988) (court is authorized to award punitive damages under state law in Chapter 7 dischargeability proceeding); *Lisk v. Criswell (In re Criswell)*, 44 B.R. 95, 97-98 (Bankr. E.D. Va. 1984) (denying debtor's motion to dismiss punitive damages count in nondischargeability action).